UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH ISLAND INSTITUTE, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>    v.<br><br>TOM QUINN, in his official capacity as Forest Supervisor for the Tahoe National Forest; and UNITED STATES FOREST SERVICE, an agency of the Department of Agriculture,<br><br>    Defendants. | No. 2:14-cv-01723-GEB-EFB<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**[*] |

Plaintiffs seek a preliminary injunction enjoining implementation of the United States Forest Service's Big Hope Fire Salvage and Restoration Project ("Big Hope Project") with the exception of felling "true hazardous trees on roads maintained for public use (otherwise known as maintenance level 3, 4, & 5 roads) after . . . August 31, 2014," until "Defendants fully comply with the [National Environmental Policy Act ('NEPA') and the National Forest Management Act ('NFMA')]." (Pls.' Mot. for Prelim. Inj. ("PI Mot.") 1:16-19, ECF No. 20.)

---

[*] This matter is suitable for decision without oral argument. E.D. Cal. R. 230(g). Therefore, the August 1, 2014 hearing is vacated.

1

For the reasons stated below, although Plaintiffs are "likely to suffer irreparable harm" in the absence of a preliminary injunction, Plaintiffs have not shown that "the balance of equities tips in [their] favor" or that a preliminary "injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008) (stating the elements a plaintiff must satisfy to obtain a preliminary injunction). Therefore, Plaintiffs' motion for a preliminary injunction is DENIED, and the Court need "not address the underlying merits of [P]laintiffs' claims." Id. at 31.

## I. FACTUAL BACKGROUND

During August and September 2014, the American Fire burned approximately 22,480 acres of National Forest System ("NFS") lands in the Tahoe National Forest and approximately 4,960 acres of private land. (Admin. Record ("AR") 7, 288.) "An interdisciplinary team assessed the effects of the fire . . . to develop a proposal for post fire treatment activities . . . . One of the resulting proposals became the [Big Hope Project]." (AR 8.)

The Big Hope Project Area boundary includes approximately 23,000 acres of NFS lands and approximately 5,000 acres of privately owned land. (Id.) The Big Hope Project's proposed treatment activities include:

> salvage harvest of fire-killed trees with ground based equipment (approximately 3,010 acres)[;]
>
> salvage harvest of fire-killed trees with aerial (cable or helicopter) logging systems (approximately 435 acres);

2

> . . . removing trees posing a safety hazard along roads and trails and at trailheads and recreations sites (approximately 125 miles / 5,520 acres)[;]
>
> site preparation, conifer tree planting, and release of planted trees in burned areas (approximately 7,300 acres); and
>
> road repair and maintenance, as needed, for approximately 125 miles of existing National Forest Transportation System (NFTS) roads.

(AR 289.) "Some areas would receive various combinations of treatments. The total footprint of treatments on national forest lands under the [Big Hope Project] would be approximately 10,566 acres." (AR 9.)

The Big Hope Project's stated purposes are: "(1) recovering the economic value of fire-killed trees; (2) reducing public safety hazards along roads and trails and at trailheads and recreation sites; (3) reducing the danger and difficulty of suppressing future wildfires; and (4) re-establishing forested conditions and habitats in burned forest stands in the American Fire area." (AR 9, 288.)

The Big Hope Project's Environmental Assessment ("EA") and Emergency Service Determination explain the scope of the Big Hope Project's roadside hazard tree removal as follows:

> Roadside hazard tree removal . . . is designed to insure safe travel routes on Forest Service System Roads for public, special use permitees, private landowners, employees, contractors, recreational users and any visitor who drives these roads to access private lands. [The Project] proposes to treat 5,519 acres for roadside hazards.

(AR 44.)

3

> Approximately 125 miles of roads and trails within the American Fire Area have been identified as needing hazard tree abatement under the Big Hope Project. Designated recreation trails that need hazard tree abatement include the Western States Trail (approximately 7 miles of singletrack segments of the Trail and approximately 18 miles of Trail segments that are shared with roads); the Loop 6 Off Highway Vehicle Route (approximately 2.25 miles); and Grouse Creek Jeep Trail (approximately 1 mile). Hazard tree abatement is proposed for the Robinson Flat Recreation Site as well as at specific trailheads, parking areas, and other locations used for race event aid stations, including Devils Thumb, Deadwood, Sailor Flat, and Ford Point. . . . The road systems in this area are utilized by the public for recreational uses, including hunting, fishing, hiking, camping, wood cutting, picnicking, and sightseeing. This area is also used by local miners for mineral extraction as permitted on National Forest System lands.

(AR 4625.)

> The purpose [of the Big Hope Project's roadside hazard tree removal] is to remove currently hazardous trees (dead trees and live trees with high failure potential) and trees that are predicted to die from fire-injuries (and will therefore become hazardous in the near future) that may fall and hit the road prism in a timely, efficient and cost-effective manner.
>
> In the context of recreation resource management, hazard is some exposure to the possibility of loss or harm. With reference to trees, it is the recognized potential that a tree or tree part will fail and cause injury or damage by striking a target. It is often . . . common practice to refer to such trees as "hazard" or "danger trees". . . . All standing trees alive or dead within areas occupied by people, structures and property present some level of hazard. Potential for failure by itself does not constitute a hazard. Hazard exists when a tree of sufficient size and mass to cause injury or damage is within striking distance of any object of value (people, property, etc.). Hazard increases with increasing tree defect,

4

> potential for failure, potential for damage and target value. Management actions are taken to mitigate the hazard when risks are unacceptable.
>
> *The Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region (*Angwin et al 2012) provides direction on hazard tree identification and abatement. In addition, since it is reasonably anticipated that tree mortality associated with fire-injury may occur for years subsequent to the American Fire, the project will also use the "*Marking Guidelines for Fire-injured Trees in California*" (Smith and Cluck 2011) which is based upon tree mortality models from the latest scientific research by Pacific Southwest Region Forest Health Protection Staff and Fire Sciences Laboratory at the Rocky Mountain Research Station (Hood et al. 2010; Hood et al. 2007; Hood 2008; Ryan and Reinhardt 1988).
>
> . . . .
>
> Within hazard tree treatment areas, all trees of merchantable size that meet the high failure potential marking criteria of the *Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region* (Angwin et al. 2012) or the Pm of 0.7 marking criteria of the *Marking Guidelines for Fire-Injured Trees in California* (Smith and Cluck 2011) would be harvested.
>
> The roadside hazard tree removal as implemented through the marking guidelines would result in reduced snags and green trees with defects within striking distance of roads and facilities. It would also reduce the amount of fire-injured trees that would likely die[,] resulting in reduced snag recruitment within striking distance of roads and facilities. The purpose and spirit of the marking guidelines is to remove those trees that are current hazards due to structural defect (includes dead trees) and those that are predicted to die and become hazards in the near future in order to protect forest visitors and improve safety and access. The marking guidelines would retain those trees that are not deemed a current or future potential hazard in order to provide continuous forest cover that maintains high visual quality and enhances ecological and

5

recreational values.
(AR 44-45.)

Some hazard tree removal occurred immediately following the American Fire as part of a series of "burned area emergency response (BAER) treatments." (AR 4618.)

> BAER activities focused on actions needed to address immediate threats to public safety and resource damage. These actions included a limited scope of . . . felling imminent hazard trees along approximately 22 miles of roads and trails . . . . Hazard trees felled during fire suppression and BAER activities consisted of older dead, decomposed and structurally unsound trees; recent fire-killed trees that were structurally sound at the time were left standing. In addition, hazard trees were removed along only a small subset of the burned area's roads and trails. As standing fire-killed trees along the roads and trails in the burned area deteriorate and decay over time, threats to human health and safety will increase.

(Id.)

The EA indicates that if the Project's hazard tree removal does not occur, "[p]ublic safety w[ill] be at risk due to standing hazard trees near trails trailheads and dispersed recreation sites." (AR 153.)

The Big Hope Project's salvage harvest "proposes to economically recover fire-killed trees through salvage on approximately 3,443 acres." (AR 45.) "Hazard trees would be removed along roads in the salvage areas as well." (Id.) Gross timber sale revenue from the salvage harvest is estimated at approximately $10 million, with approximately $962,500 of net revenue going directly to the Forest Service for implementation of the Project. (AR 31, 158.) Implementation of the Big Hope Project is anticipated to

6

>           provide an estimated 380 jobs in the lumber
>           and wood products sector during
>           implementation of the timber sales and 170
>           jobs under the service contracts for site
>           preparation, tree planting, and release
>           treatments. In total, the [Big Hope Project]
>           is estimated to directly create 550 jobs from
>           the gross timber revenue, combined with
>           Congressional appropriations. An estimated
>           additional 940 jobs would be created through
>           the multiplier effect. Workers will need
>           supplies, equipment, fuel, and repair shops,
>           which will indirectly benefit the local
>           community.

(AR 291-92.) Of the referenced jobs, over fifty of them are expected to go to employees who work for several companies owned by Nathan Bamford and his family. (Decl. of Nathan Bamford ¶¶ 1-7, ECF No. 24.) Nathan Bamford is a co-owner of Intervenor J.W. Bamford, Inc. ("Bamford"), the purchaser of the Project's salvage sale.[1] (Id. at ¶¶ 2-3.)

The Forest Service requested an Emergency Service Determination ("ESD") for the Big Hope Project "based on threats to human health and safety . . . and the loss of commodity value that would jeopardize critical restoration and resource protection activities if the project is delayed." (AR 4675.) The Chief of the Forest Service found that the Big Hope Project qualifies as an "emergency situation" under 36 C.F.R. § 218.21 and granted the ESD on June 13, 2014. (AR 4676.)

The ESD states:

>           Without an ESD, the Big Hope . . .
>           project would begin implementation in October
>           2014, at the earliest, due to the need to
>           offer a predecisional objection opportunity.
>           The normal operating period in this area is
>           June 1 to October 15 and therefore there is a
>           high likelihood that implementation would not

---

[1] Bamford purchased the salvage sale on July 14, 2014. (Id. at ¶ 3.)

7

> begin until 2015.
>
> The forest estimates that the delay would reduce timber sale volume from 48 million board feet to about 20 million board feet. This reduction would result in sales that would be deficit [sic] and likely offered at base rates. Preliminary appraisal indicates the cost of logging and the reduction in volume and value would almost certainly lead to no bids for the sales.
>
> Net return to the Government with an ESD is estimated to be about $964,000; without an ESD and with no bid, there would be no sale return to the Government and a delay of other actions to protect human health and safety until funds became available.

(AR 4676.)

The ESD states "the ability of the Tahoe National Forest to accomplish the purpose and need for the project is strongly tied to the timing of the salvage harvest and hazard tree removal." (AR 19.)

> Local timber industry representatives . . . expressed interest in the project provided that salvage harvest and hazard tree removal operations can be completed by the end of the 2014 field season. The Forest's assessment of available logging and trucking capacity indicates that the timber volume included in the Big Hope Project could be removed over an estimated five-month period. Winter weather usually precludes logging and trucking operations after November. Hence, an ESD would provide the needed five month operating period from early July to late November/early December to complete salvage harvest and hazard tree removal activities by the end of the 2014 field season. . . . [I]mplementing the project in 2014 would result in the lowest economic losses to the government due to less timber deterioration, thereby allowing the Forest Service to effectively conduct the restoration work associated with removing the burned timber. Finally, implementation of the Project in 2014 would address hazards to human health and safety within the project area at the

> start of the summer season when this area receives its highest levels of human use.
>
> Without an ESD, . . . award of the timber sale contracts would be delayed until [at least] early October 2014, providing possibly up to two months to conduct salvage harvest and hazard tree removal under the most favorable weather conditions. The likelihood of receiving bids for a contract this late in the season is extremely low due to both substantial deterioration of the timber[2] during [July – October] and the difficulty a contractor would have in mobilizing woods workers and equipment so late in the season. The risk to the contractor would be extremely high and the Forest's sensing with industry indicates that a contract offered this late in the season would receive no bids. . . . Prospective bidders have indicated little to no interest in the salvage project after 2014 due to loss of value to the timber as a result of deterioration of the fire killed trees.

(AR 4624-25.) Bamford, the ultimate purchaser of the salvage harvest states it "purchased the [salvage sale] with the expectation that salvage work could commence promptly so that the work can be completed this year, while the wood still has value." (Decl. of Nathan Bamford ¶ 13.)

The ESD also states: "Ultimately, if the Big Hope Project is delayed, the cost of removal will far exceed the value of the trees, and the Forest Service will be faced with the dilemma of responding to increasing safety hazards . . . with no funds available . . . ." (AR 4631.) Without a salvage harvest sale, "[f]unds for neutralizing hazard trees . . . would have to come completely from congressionally appropriated funds." (AR 160; see also AR 4636 ("Actions that still must be completed,

---

[2] The ESD sets forth the scientific bases for its conclusions concerning timber deterioration levels at pages 14-17. (AR 4626-4632.)

9

1  such as ensuring human health and safety, would be delayed and
2  would only proceed to the extent that funds became available.").)
3  Forest Supervisor for the Tahoe National Forest, Tom Quinn, avers
4  that "[Congressionally appropriated funds] are extremely
5  limited[,] and the Forest is facing a backlog in this work,
6  making [it] infeasible over this large [project] area" to fell
7  the hazard trees. (Decl. of Tom Quinn ¶ 29, ECF No. 39-2.)
8  Plaintiffs object to the Court's consideration of this paragraph
9  of Mr. Quinn's declaration, arguing it "contains unsubstantiated
10 opinion and improper legal argument." (Pls.' Mot. to Strike
11 Extrarecord Evid. 5:17, ECF No. 44.) However, Mr. Quinn's
12 knowledge of the Tahoe National Forest's budgetary constraints
13 can be inferred "by virtue of his . . . position [as Forest
14 Supervisor for the Tahoe National Forest]." United States v. Real
15 Prop. Located at 475 Martin Lane, Beverly Hills, Cal., 298 F.
16 App'x 545, 551 (9th Cir. 2008); accord Barthelemy v. Air Lines
17 Pilots Ass'n, 897 F.2d 999, 1017 (9th Cir. 1017) ("[P]ersonal
18 knowledge and competence to testify [can be] reasonably inferred
19 from [a declarant's] position[] and nature of [his] participation
20 in the matters to which [he] swore . . . ."). Therefore,
21 Plaintiffs' evidentiary objection is overruled.[3]

## I. DISCUSSION

23 Plaintiffs seeking a preliminary injunction must
24 establish that "(1) they are likely to succeed on the merits; (2)
25 they are likely to suffer irreparable harm in the absence of

---

[3] Plaintiffs also object to several other paragraphs in Mr. Quinn's declaration. However, those objections need not be addressed since the remaining averments were not considered in deciding Plaintiffs' preliminary injunction motion.

10

preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing Winter, 555 U.S. at 20).

### A. Irreparable Harm

Plaintiffs argue concerning irreparable harm, in part, as follows:

> The Big Hope . . . project[] . . . involve[s] the logging of several thousand acres of post-fire habitat, removing and degrading thousands of acres of rare and biodiverse complex early seral forest [("CESF")], removing a substantial and significant amount of all the suitable Black-backed Woodpecker habitat which currently exists on the Tahoe . . . National Forest. The[] Project[] also involve[s] removal of thousands of acres of suitable habitat for the imperiled California spotted owl . . . . If planned logging is permitted, thousands of acres of rare and precious habitat would be irreparably removed, and Plaintiffs' ability to view, enjoy, photograph, and study these unlogged areas and the rare species which inhabit them in an unlogged/natural state would be lost for generations, as would Plaintiffs' ability to enjoy nature's renaissance on display, observing unmanaged complex early seral forest on these acres as it changes through the years.
>
> These irreparable harms outlined above—to both the Plaintiffs' members and the wildlife that currently inhabit this burned forest ecosystem which is proposed for logging—are likely because they would occur as soon as the trees are felled, which according to Defendants will begin on August 1, 2014.

(PI Mot. 22:23-28.)

Plaintiffs "have shown that the [Big Hope] Project will lead to the [salvage harvesting] of thousands of [acres] of [CESF]. The logging of [CESF], if indeed incorrect in law, cannot

11

1 be remedied easily if at all." League of Wilderness
2 Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752
3 F.3d 755, 764 (9th Cir. 2014); accord Amoco Prod. Co. v. Vill. of
4 Gambell, Alaska, 480 U.S. 531, 545 (1987) ("Environmental injury,
5 by its nature, can seldom be adequately remedied by money damages
6 and is often permanent or at least of long duration, i.e.,
7 irreparable."). Accordingly, "[t]he harm here . . . is
8 irreparable for the purposes of the preliminary injunction
9 analysis." Id.; see also Alliance for the Wild Rockies v.
10 Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (indicating the
11 lost use and enjoyment of 1,652 acres of harvested forest
12 constitutes an irreparable injury).

13 However, that is not the end of the inquiry. "A
14 preliminary injunction is an extraordinary remedy never awarded
15 as of right." Winter, 555 U.S. at 24. "In each case, courts 'must
16 balance the competing claims of injury and must consider the
17 effect on each party of the granting or withholding of the
18 requested relief.'" Id. (quoting Amoco Prod. Co., 480 U.S. at
19 542). "In exercising their sound discretion, courts of equity
20 should [also] pay particular regard for the public consequences
21 in employing the extraordinary remedy of injunction." Id. "Our
22 law does not . . . allow [the Court] to abandon a balance of the
23 harms just because a[n] . . . environmental injury is at issue."
24 Lands Council v. McNair, 537 F.3d 981, 1005 (9th Cir. 2008),
25 overruled on other grounds by Amer. Trucking Ass'ns Inc. v. City
26 of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009). "Indeed, the
27 Supreme Court has instructed us not to 'exercise [our] equitable
28 powers loosely or casually whenever a claim of environmental

damage is asserted.'" Id. (quoting Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures, 409 U.S. 1207, 1217-18 (1972)).

### B.   Balance of Hardships / Public Interest

Since the parties' arguments concerning the balancing of hardships and public interest factors are sometimes conflated, the Court discusses these factors together.

Plaintiffs contend both "the balance of the harms and public interest weigh in favor of the issuance of an injunction in this case." (Pls.' Reply 8:12-13, ECF No. 43.) Plaintiffs argue: "The only hardship the Forest Service may claim is that their revenue will be reduced if Plaintiffs' request is granted, but the loss of anticipated revenues does not outweigh the potential irreparable damage to the environment." (PI Mot. 24:1-3 (ellipses, internal quotation marks, and citation omitted).) Plaintiffs contend "economic loss during the pendency of an injunction does not represent a complete and total loss, akin to the loss of habitat, but rather a delay and potentially a reduction in revenue." (Pls.' Reply 8:2-6.) Plaintiffs further argue that injunctive relief serves the public interest of "ensuring careful consideration of environmental impacts before major federal projects go forward, and suspending such projects until that consideration occurs comports with the public interest." (Id. at 24:7-14 (internal quotation marks and citations omitted).)

Defendants and Bamford counter that the balance of hardships and public interest favor denial of Plaintiffs' motion. Defendants argue: "A delay in project implementation could be the

death knell for [the] project. . . . [I]f the project[] do[es] not go forward[,] . . . the government will lose the opportunity to receive the prime economic value of the timber and could lose the ability to do the project[] at all . . . ." (Defs.' Opp'n 25:6, 26:19-26, ECF No. 39.) Defendants further argue, *inter alia*, the project

> promote[s] public safety. . . . Fire-killed trees pose serious safety hazards along the roads, recreation sites, trailheads, and parking areas in Aspen and Big Hope. Removal of hazard trees along roads and heavily used trails is essential for providing safe access to the area for the public, Service employees, contractors and adjacent private land owners.

(Defs.' Opp'n 24:15-21.) Defendants also argue "the[] communit[y's] econom[y] would benefit from [the] project. . . . [Without the project,] the public will lose the benefit of a boost to the local economy as a result of the [project's] creation of jobs . . . ." (Id. at 25:23, 26:19-22.) In addition to the public interests raised by Defendants, Bamford argues its private economic interests also weigh against granting a preliminary injunction. (Intervenor's Opp'n 11:4-22, 16:4-26, ECF No. 29.)

Plaintiff replies that Defendants' "public health and safety" argument is "devoid of substance" since "Defendants have already completed hazard tree removal on the main roads through the first areas[,]" and "Plaintiffs are not requesting to enjoin hazard tree felling on roads maintained for public use . . . beyond August 31, 2014." (PI Mot. 25:7-12, 5:13-18.)

"Balancing the equities in this case requires comparison between the irreparable environmental harms pled by

14

the [Plaintiffs], on the one hand, and the economic interests of [Bamford and the Defendants], on the other hand." Connaughton, 752 F.3d at 765. "Both the economic and environmental interests are relevant factors, and both carry weight in this analysis." Id.

"The public interest inquiry primarily addresses impact on non-parties rather than parties." Connaughton, 752 F.3d at 766. "On the side of issuing the injunction, [the Court] recognize[s] the well-established 'public interest in preserving nature and avoiding irreparable environmental injury.'" Alliance for the Wild Rockies, 632 F.3d at 1138 (quoting Lands Council, 537 F.3d at 986). "Th[e Ninth Circuit] has also recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . ha[s] held that suspending such projects until that consideration occurs 'comports with the public interest.'" Id. (quoting South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior, 588 F.3d 718, 728 (9th Cir. 2009)). "[A] preliminary injunction, however, [should not be granted] unless those public interests outweigh other public interests that cut in favor of not issuing the injunction." Id.

Here, although the Big Hope Project results in the irreparable salvage harvesting of thousands of [acres] of [CESF], the balance of hardships and public interest weigh against granting a preliminary injunction. As explained in the ESD, because of timber deterioration rates and the approaching close of the harvesting season in December 2014, a delay in commencing the Big Hope Project, even until October 2014, jeopardizes the

entire project. Thus, Bamford and Defendants' economic losses, as well as the loss of approximately 1,000 jobs locally, would be permanent, not temporary. Further, without realizing the profit from the salvage harvest, the Forest Service would be unable to remove the hazard trees threatening public health and safety. Although the Forest Service already removed some of the hazard trees in its immediate response to the American Fire, that emergency response was done "along only a small subset of the burned area's roads and trails" (22 miles of roads and trails out of the total 125 miles identified for treatment). (AR 4618.)

The Court finds "these [permanent] economic [losses], in combination with the [public] safety concerns . . . outweigh [the referenced] harms to environmental interests." Earth Island Inst. v. Carlton, 626 F.3d 462, 475 (9th Cir. 2010) (affirming district court's denial of preliminary injunction motion); see also Lands Council, 537 F.3d at 1005-06 (affirming district court's denial of preliminary injunction motion, stating: "Though preserving environmental resources is certainly in the public interest, the Project benefits the public's interest in a variety of other ways.").

For the stated reasons, Plaintiffs' preliminary injunction motion is DENIED.

Dated: July 31, 2014

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge